UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**UNITED STATES**,                                                    Criminal Case No. 3:08-95-KI

                Plaintiff,                           OPINION AND ORDER ON
                                                                     MOTIONS FOR SUPPRESSION

    v.

**ANDREW FRANKLIN KOWALCZYK**,

              Defendant.


      S. Amanda Marshall
      United States Attorney
      Scott M. Kerin
      Gary Y. Sussman
      Assistant United States Attorney
      1000 SW Third Avenue, Suit 600
      Portland, OR 97204

          Attorneys for Plaintiff

Noel Grefenson, P.C.
Attorney at Law
1415 Liberty Street SE
Salem, OR 97302

      Attorney for Defendant

      Andrew Kowalczyk is charged in a Superseding Indictment with nine counts of Sexual

Exploitation of Children.  Pending before me is Kowalczyk's 291-page Pro Se Motion for

Suppression [224][1] and a counseled Motion for Suppression [141].   For the following reasons, I

deny the motions.

## FACTUAL BACKGROUND

      The following facts were adduced at an evidentiary hearing:

I.    Traffic Stop

      Just after midnight on December 27, 2007, a Des Moines, Washington police sergeant

named Sergeant David Bell saw a black four-door Lincoln Town Car, with Washington license

plates 569 WNR, traveling in the same direction as he was at a speed between 55 and 60 mph in

a 45 mph zone.  He saw it pass other cars on the road about one minute or more before the video

camera on his police car was activated.  Sergeant Bell, in a marked police car, pulled behind the

Lincoln and paced it going between 50 and 55 mph.  While it was not a calibrated speedometer,

Sergeant Bell has found his patrol car's speedometer to be accurate based on GPS and a handheld

speed measuring device.  When he ran the license plates through his computer, the car registered

---

[1]Kowalczyk is represented by an attorney, but I gave him permission to file additional
motions his counsel declined to prepare on his behalf.  Many of the arguments he makes overlap
those of his attorney's.  Where necessary or helpful, I have separately identified the motions
Kowalczyk makes on his own.  Kowalczyk has also separately filed an additional approximately
70 pages of supplemental or post-hearing pro se briefing.  I have addressed those arguments
raising remotely meritorious issues, but I have not responded to every single challenge.

as belonging to Alex Craciun. The license plate check automatically ran through Washington Crime Information Center ("WACIC") and the National Crime Information Center ("NCIC"), which checked on warrants associated with the registered owner and would have alerted Sergeant Bell if the car was reported stolen. Sergeant Bell then stopped the Lincoln after watching it make a U-turn against a red light.[2] The police car had a video camera, which was triggered when Sergeant Bell pulled behind the Lincoln and activated his overhead lights, and which automatically captured the previous pre-recorded 30 seconds. Sergeant Bell testified that although the area was known for prostitution, he had not stopped the car on that basis. He did remember other officers discussing, after the stop and elude, having seen the Lincoln cruising that area before and speculating it was there for prostitution-related reasons; Sergeant Bell testified he did not learn about this until after the traffic stop.

After the Lincoln pulled over, Sergeant Bell approached the car and asked the driver for his license, registration and insurance. Sergeant Bell could see the driver through the driver's window. The spotlight of the police car was pointed at the Lincoln and it was a well-lit intersection. Sergeant Bell also used his flashlight. He testified he had a "clear view of the driver." Tr. 50:1 (May 31, 2012). The driver responded that he did not have any documents or identification; he looked for the title in the driver's side door pocket. When Sergeant Bell asked the driver if he was the owner of the car, the driver hesitated. He said his name was "Walter George," gave his date of birth, said that he did not have a Washington license, but did have an

---

[2]There was some testimony about traffic control changes at the intersection believed to have been made at some point, and the possibility of a non-operative light controlling a left-turn lane. The video recording depicts a red light controlling the *only* left turn lane, marked with an arrow on the street, which turned green after the Lincoln made its U-turn. The remaining southbound lanes remain controlled by two red lights.

Ohio license.  He said his I.D. was in his motel room, which he then identified as the Northwest

Motor Inn in Puyallup, Washington.  Sergeant Bell noticed that "Walter George" did not match

the registered name of "Alex Craciun."

Sergeant Bell remembers that an officer named Robert Bagsby, who happened to be in the

area, arrived as a cover officer.  Officer Bagsby approached the passenger side door and informed

Sergeant Bell about what looked like two containers of alcohol inside the car.  When he learned

of this, Sergeant Bell asked a DUI enforcement officer to respond to the scene to evaluate

whether the driver was impaired.

Sergeant Bell returned to his police car and ran a computer check on the name and date of

birth the driver had given, resulting in a "no computer record found" response.  The automated

search checked Washington Department of Licensing, Access,[3] WACIC, NCIC, and the Felony

Offender Reporting System ("FORS").  The computer would not normally inquire into the

Department of Corrections unless the Department had entered something into one of those other

systems.  Sergeant Bell asked his dispatch to check Ohio records, but no record was found of an

Ohio driver's license in the name of Walter George, either.

Sergeant Bell returned to the Lincoln and informed the driver he was unable to locate a

record of him in Washington or Ohio.  He asked the driver to step out of the car.  The driver did

not move.  Sergeant Bell repeated his instruction to step out of the car.  Sergeant Bell then

attempted to open the driver's door, but it was locked.  At that point, the driver quickly put the

car in gear and drove off.  Sergeant Bell got back in his car and started following the Lincoln,

---

[3]Sergeant Bell described this database as "the Washington code for dissemination of information."  Tr. 52:25-53:1 (May 31, 2012).

using his lights and siren.  Officers Bagsby and Gradden (the DUI enforcement officer who was

on his way anyway) followed the car.  Officer Arico also joined in the chase.  Based on Bell's

speed of 90 to 100 mph, Bell estimated the Lincoln exceeded speeds of 100 mph driving north on

Pacific Highway.  Police stopped the chase when they realized they could not overtake the

Lincoln or deploy spikes.

 Sergeant Bell wrote his initial incident report three hours after the incident.  He wrote a

follow-up report, making entries substantially contemporaneously with the events as they

occurred, which he completed and signed off on January 8, at 5:44 p.m.

II. <u>Arrest</u>

 At Des Moines' request, Bellevue police contacted Alex Craciun who reported selling the

Lincoln to "Walter George" one or two months earlier.  Craciun described the buyer as a white

male with shoulder length, dark brown hair and a goatee.

 Sergeant Bell asked the Puyallup police to see if the black Lincoln was parked at the

Northwest Motor Inn (the motel is in Puyallup's jurisdiction).  Puyallup police reported that the

Lincoln was not there.  At about 4:00 a.m., Puyallup police saw the Lincoln parked outside

rooms #121 and #122.  A motel employee informed Puyallup officer Scott Lien that the

registered guest associated with the Lincoln bearing license plates 569 WNR was staying in room

#122; he "noted the picture I.D. (Texas Driver's) showing the suspect vehicle to be associated

with, Benny S. Mazzola (DOB 04-18-72) currently renting the room at #122."  MTS-105, at

KOWAL00011.  The registry reflected dates of "Oct. 2 through Oct. 9," but despite the check-out

date the employee represented the information applied to room #122.  Kowalcyzk confirmed in

his testimony that he had been living at the motel since October 2.

Page 5 - OPINION AND ORDER ON MOTIONS FOR SUPPRESSION

Officer Lien then contacted Sergeant Bell, who explained the Lincoln had been seen several times within a few hours in a known prostitution area.  He described his interaction with the driver, the Lincoln's eluding, and asked the Puyallup police to remain with the Lincoln until it was impounded.  Officer Lien understood Des Moines had probable cause to arrest, and informed Sergeant Bell that Puyallup officers would attempt to make contact when a Des Moines officer arrived.  Officer Lien subsequently learned from Puyallup dispatch that the name "Benny Mazzola" was a known alias for Andrew Kowalczyk, who had an active arrest warrant from Washington County, Oregon for an August 31, 2007 failure to appear on an Unlawful Use of a Weapons charge.[4]  He did not remember whether he confirmed the warrant.  Kowalczyk's previous arrests (but not convictions) consisted of:  weapons violations, Rape in the Second Degree, felony eluding, reckless endangerment, and harassment.  The records check indicated "Caution Armed and Dangerous" and an escape risk.  He did not know if the motel's occupant posed a danger to officers or not.  Dispatch records reflected, "spoke to Beaverton PD on the subject.  They have extensive history.  The firearms incident involved the subject pointing a .45 in the face of an auto body shop owner he was angry with.  Has several eluding cases in Oregon." MTS 128, at 2.

Washington County police sent a booking photograph of Kowalczyk to Puyallup.  Puyallup faxed the booking photograph to Sergeant Bell.  Sergeant Bell noted that the black and white fax was not good quality, that the photograph did not show any facial hair, and the subject had a different hairstyle, but he was 90 percent sure that the person in the photograph was the

---

[4]He learned the charge of unlawful use of a weapon was for "unlawful use of a weapon x 4," "menacing x 4," "pt firearm at another x 4," and "reckless endanger another x 4."  MTS-267.

driver of the Lincoln. He testified that he based his opinion on the structure of the face and the nose, and commented that the side profile depicted in the booking photograph was particularly helpful since that was the angle from which he saw the driver during the traffic stop. He testified that he relayed this information by radio to Officer Bagsby while Officer Bagsby was still at the scene around 6:00 a.m. Many communications are captured on a CD containing dispatch communications, but not this one. (After Kowalczyk's arrest, on January 8, Sergeant Bell identified Kowalczyk from a photo montage of six images.[5] There is no evidence or testimony that Sergeant Bell saw or was influenced by any media coverage of the case before he made his identification.)

Officer Lien compared the motel's driver's license photograph of "Benny Mazzola"[6] with a Pierce County, Washington booking photograph (taken when Kowalczyk was arrested on the Second Degree Rape charge), and with the booking photograph associated with the Oregon failure to appear warrant, and confirmed that the pictures matched.

The Des Moines police towed the Lincoln to its police department around 6:00 a.m. Sergeant Bell testified that he had probable cause to arrest for the felony elude, but the warrant took precedence over the elude. Des Moines radio dispatch communications contain repeated assertions of probable cause.

Puyallup officers knocked on the motel door giving verbal commands to the occupant to

---

[5]While Sergeant Bell's testimony on the pick from the six-pack photo montage was confused, Sergeant Dave Mohr credibly testified about the circumstances of the later identification.

[6]Officer Kleffman testified about getting a copy of the motel's registry, and explained he did not take the original. He testified, however, that the motel's copy was clearer than his copy and that he could see it depicted Kowalczyk.

open up and show himself.  They also called room #122.  They got no response.

At 7:00 a.m., Sergeant Bell asked Sergeant Dave Mohr to prepare an affidavit for a search warrant to look for evidence in the Lincoln that would help confirm the identity of the driver and the true owner of the car.  He was not satisfied by the driver's insistence that there were no documents in the car.  Furthermore, since the car had been involved in a felony, it was subject to seizure under Washington law.

Around 7:53 a.m., Puyallup Officer Adam Kleffman took over for the night shift officer at the motel, who told him the motel occupant had an armed and dangerous warrant out of Oregon and had been known to have a .45 caliber handgun with him.  The night shift officer also provided a description of the occupant–white male, facial hair, with long brown hair.  Officer Kleffman understood Puyallup was on surveillance of the motel room based on the fact that the occupant was believed to have fled from Des Moines police the night before.  He began watching room #122 from across the street–probably using a pair of binoculars–when he saw a taxi van pull into the motel parking lot.  As the cab pulled in, the door to room #122 opened and a white male with shoulder length brown hair and a brown goatee looked out, matching the description the night shift officer had given Officer Kleffman.  The room's occupant started carrying bags from the room to the taxi.  The occupant made approximately two trips from the room to the taxi, although Officer Kleffman admitted he may have lost sight of the occupant as he drove into the parking lot.  When Officer Kleffman reached the motel's parking lot, he got out of the car and hid behind a brown sport utility vehicle.  He waited for the room's occupant to come back out for approximately the third time.

At about 8:19 a.m., the occupant exited his room, carrying two pieces of luggage and a

backpack,[7] leaving the door to his room open.[8]  Officer Kleffman using the stairwell just south of

the room as cover, approached the man with his gun drawn and held at a low-ready position, no

more than ten feet away, identified himself as a police officer and ordered the man to the ground.

The motel room was behind him and to his right.[9]  The man turned and looked at the police

officer, but did not immediately comply.  Instead, he looked back towards the taxi cab and

northbound fenced area and Officer Kleffman thought the subject might run.  Officer Kleffman

repeated his statements and the man complied, getting on the ground in a high-risk arrest

position.  Officer Kleffman asked him if he was Andrew Kowalczyk, and the man answered

"yes."  Officer Kleffman held Kowalczyk at gun point until a back-up officer arrived.

      Puyallup Officer Dave Temple placed handcuffs on Kowalczyk and put him in the back

of his patrol car.  Dispatch reflects that police "had one in custody" at 8:19:40.  MTS 128, at 4.

III.    Cursory Search and Search Incident to Arrest

      While Kowalczyk was placed in the back of the police car, Officer Kleffman and one

other officer undertook a quick cursory search of room #122 to confirm no one else was in the

room.  There was a back bathroom that officers could not see into from outside the open

doorway.  According to dispatch, the "room [was] clear" as of 8:20:33, less than a minute after

---

    [7]I explain below how I came to this conclusion.

    [8]Kowalczyk testified that he closed the door behind every time after exiting the room,
even though he was carrying heavy luggage and in a hurry.  I do not find this testimony to be
credible.

    [9]Defense counsel interprets Officer Kleffman's testimony as the open hotel room *door* is
behind him and to his right, but Officer Kleffman answered the question, "So this open hotel
room, is it behind you?"  Tr. 160:10 (May 31, 2012).  He confirmed later that "when I was
holding him at gunpoint, I was up by the window.  I wasn't by the fatal funnel of the door."  Id. at
197:2-3.

Kowalczyk had been placed under arrest.  Looking to the room from outside through the open

door, Detective Visnaw could see a desktop computer, a flat screen computer monitor, a box for

a computer printer, a box for a computer scanning device, and a backpack.  Finding the room

empty of people, the officers left.  They did not seize or remove anything.

   While officers were conducting the cursory search of the motel room, Officer Joseph

Pihl advised Kowalczyk of his Miranda rights; Kowalczyk invoked his right to remain silent.

   The Puyallup police then searched the bags Kowalczyk had been carrying at the time of

his arrest.  Although there was some conflicting testimony, which I will address in detail later,

officers generally testified to three bags laying on the ground at the site of Kowalczyk's

arrest–two large, nylon suitcases, alternately described as dufflebags, and a black backpack.

Officers testified that they were concerned he could have a firearm given the armed and

dangerous warrant out of Oregon, the underlying crime of unlawful use of a weapon, and his

being known to carry a .45 caliber handgun

   Officer Kleffman found a file box inside the black duffle bag containing photo printer

paper with computer-generated I.D. cards from a number of states, bearing Kowalczyk's picture

and different names and dates of birth.  Officer Kleffman testified that the file box was big

enough to have a weapon in it.  He also found computer and computer-printer-generated

counterfeit money in $5 to $50 bills, along with printer ink.  Officer Kleffman also found a Texas

I.D. card with Kowalczyk's name on it, an Ohio I.D. card with Kowalczyk's picture and the

name "Walter George," and a Washington Mutual credit card in the name of Deangelo L. Hunter

in a smaller bag containing personal hygiene items.  He also found a laptop computer and a credit

card scanner.

Officer Pihl, who was assisting in the search, and who searched the last bag of the three, found a digital camera in the top zippered pouch of one of the bags. He turned the camera on to see if he could find additional evidence of fraud. Instead, Officer Pihl found images depicting sexually explicit conduct involving a very young child.

Detective Visnaw, who was present towards the end of the search, believed that the items found indicated Kowalczyk was involved in the felony crimes of identity theft and forgery. The taxi cab driver took several pieces of luggage out of the cab. Officers loaded up all the bags in Detective Visnaw's car and took them to the secure police property room. Kowalczyk did not ask officers to leave the bags at the motel or put them in the taxi cab; he had invoked his right to remain silent. Detective Visnaw testified that he anticipated obtaining a search warrant to search the motel room; he did not want to place the luggage back in the motel room because he would then be putting items within the scope of a warrant he was about to write.

At the time of Kowalczyk's arrest, police seized an Acer laptop computer, cellular telephones, iPods, a Palm Pilot, multiple computer hard drives, a thumb drive, memory sticks, two digital still cameras, a digital video recorder, miniDV video tapes, and various items used to manufacture counterfeit credit or identification cards.

IV.    Search Warrant for Motel Room

That day, Detective Visnaw applied for a search warrant to search the motel room for additional evidence of fraud. Pursuant to that warrant, officers seized two computer printers, a digital tablet (to import signatures into a computer), a computer monitor, a desktop PC without a hard drive, and some miscellaneous documents. Police left clothing in the motel room, clothing which Kowalczyk claims was worth $6,000.

V.    Search Warrant for Digital Evidence

Detective Visnaw's scheduled days off were December 29, 30, 31 and January 1.  He may have worked January 2.  He logged into the police computer system even on his days off to check his e-mail.  He could have obtained a search warrant during his time off "[i]f there had been some exigency and I had been authorized to work overtime[.]"  Tr. 392:23-24 (June 1, 2012).  He was called at home on December 30, one of his regularly scheduled days off, and ordered to come in to work.

Detective Visnaw subsequently sought and obtained a warrant, on January 3, to search all of Kowalczyk's electronic devices obtained from the motel and from the search incident to arrest, except the digital camera on which the sexually explicit photographs were found, for evidence of identity theft and forgery.  He included in his affidavit a description of the images found on the digital camera; Detective Visnaw reported the images were not being used for probable cause but that they were available to the issuing judge upon request.  A judge signed the search warrant without asking about the images.  Detective Visnaw transferred the computer equipment to Investigator Franklin Clark, of the Pierce County Prosecutor's Data Recovery Lab, for examination.

VI.    Search Warrant for Lincoln

Meanwhile, Des Moines Sergeant Mohr applied for and received a search warrant on December 31 to search the Lincoln's passenger compartment for evidence of eluding police and to confirm ownership of the car.  Sergeant Bell testified that he only saw the driver reach into the driver's door pocket; Sergeant Bell was not satisfied by the driver's assertion that he had no documents.

Page 12 - OPINION AND ORDER ON MOTIONS FOR SUPPRESSION

When police executed the warrant on January 3, officers found a five dollar bill, and an 8½ by 11 inch piece of paper folded in two, inside the glovebox.  On the paper were 12 images of a portion of a five dollar bill with the notation "Background to yellow."  There was also a "carrot sign" with the word "device" written next to it.

After finding those items,  Sergeant Mohr sought and obtained a second search warrant to look in the trunk for evidence of forgery.  On January 7, he found a U.S. Mail folder with I.D. cards with the name "Andrew Kowalczk" printed on photo paper, a box containing an ultra violet exposure unit, three receipts, and 21 pages of blank cardstock.  Under the rear passenger floor boards, they found three Western Union money transfer receipts.  Sergeant Mohr told Detective Visnaw what he found, and the evidence was transferred to Detective Visnaw.

VII.    Search Warrant for Child Pornography

On January 3, Investigator Clark began mirroring the Acer laptop hard drive.  He was able to preview the contents of the hard drive, as it was undergoing the imaging process, to ensure that it was not a blank hard drive and was worth his time.  As he was previewing the hard drive, he testified he was looking for "checks, check-writing materials.  I had several names of possible victims.  I was also looking for online purchases, text files, HTML files that might indicate online purchases."  Tr. 424:24-425:2 (June 1, 2012).  He testified that he found evidence of fraud and identity theft.  As he was scrolling through the names of the files, although he was not sure, he saw some file names that indicated they might be child pornography.  A file can be named anything the user wants and sometimes are named to look suspicious as a "ha, ha, I got you."  Id. at Tr. 426:4-5.  The files he looked at which had names suggestive of child pornography, were:  "child whore, 3 yo, baby & man, posing 4yo, mom & 2boys, baby pussy fun,

6 yo penetration."  He found files in different directories labeled with the age of the children,

which he believed showed someone willing to spend time downloading and saving the pictures.

Once he confirmed that seven of the files were child pornography, he called Detective

Visnaw and reported that he had only examined a small portion of the Acer laptop's hard drive

and had encountered images depicting minors engaged in sexually explicit conduct.[10]

Investigator Clark stopped opening the pictures believed to contain child pornography, but

continued running the mirror imaging program, which would take several hours, to look at the

hard drive image the following day.  He also noted mini digital video tapes with handwritten

names such as "Alexa, Suzana, Jane, Deetta, Limo, Andrea, Unknown, Genene."  MTS 121B, at

5.  He did not review those video tapes.

Investigator Clark prepared a report about his background and experience, and about what

he had discovered, for Detective Visnaw to include in an affidavit in support of a search warrant

to search for child pornography.

Detective Visnaw obtained a search warrant on January 4 to examine the seized digital

devices for evidence of child pornography, adding the silver digital camera that Officer Pihl had

activated at the arrest scene.[11]

VIII.    Child Pornography Investigation

 Investigator Clark began his search for child pornography pursuant to the warrant on

January 4.  He contacted Detective Visnaw later that day and reported recovering images and

---

[10]He may have made this phone call the morning of January 4.  He testified he went in
early that day.  Detective Visnaw remembers the conversation occurring on January 4.

[11]Detective Visnaw did not remember what time he received the warrant and no time is
written on the warrant.

video of minors engaged in sexually explicit conduct.  The pictures did not show the offender's face, but one showed a silver watch on his wrist.

On January 5, Puyallup police issued a press release depicting four adult women whose pictures were found on Kowalczyk's computer, hoping that someone would come forward to identify the children.

That day, Detective Visnaw also applied for and received another warrant to search Kowalczyk's personal property stored at the jail, specifically for watches and rings, to compare with the images.  After obtaining the warrant, he found a "Swiss Army" silver watch with diamonds or fake diamonds, which appeared to be the same type of watch as depicted in the photographs.

While reviewing the images again, officers found one depicting half of a woman's face with the two youngest children.  Police released the image of half of the woman's face to the media.

On January 6, a woman later determined to be the mother of three of the victims called into the tip line.  Her sister had seen the news coverage in the Portland area.  She thought the children were hers.  She asked for the name of the suspect and Detective Visnaw told her Kowalczyk.  She began "to sob uncontrollably," said she knew him, and explained how she knew him.  MTS-109, at KOWAL00097.  She said that Kowalczyk had watched the two youngest children for her at times from approximately 5-6 months until they were 2-3 years old.

On January 7, Detective Visnaw learned that Kowalczyk sometimes went by the name "Jessie."

Portland Police Detective Darrell Miller was assigned to the case after learning that the

Page 15 - OPINION AND ORDER ON MOTIONS FOR SUPPRESSION

children were from the Portland area.  He attended a CARES Northwest evaluation for the three

listed victims on January 11 and 18.  Detective Miller attempted to contact the victims' mother

on multiple occasions and finally spoke with her on January 22.  He asked her questions about

how Kowalczyk and she had met, where they stayed, and when he had access to her children.

She confirmed he had, at one point, stayed at a motel under the name of "Jessie."  At the

conclusion of the conversation, Detective Miller told her he had a number of non-pornographic

pictures to show her and asked her if she would be willing to identify where the pictures were

taken.  Detective Miller reported that she was willing to help.

Detective Miller met with the mother the next day at 4:15 p.m.  She came with an

advocate from Self Enhancement, Inc., who explained she was a domestic violence advocate who

had been working with the mother and was trying to get her into an alcohol/drug treatment

program.  The mother identified a number of the locations and people.  Detective Miller noted

the mother smelled of alcohol.

The mother and advocate met with Detective Miller the next day, and again the mother

identified several of the locations from photographs.

In late January, the Department of Homeland Investigations, formerly known as

Immigration and Customs Enforcement, got involved in the case.  Special Agent Josh Findley,

one of four agents assigned specifically to child sexual exploitation cases in the District of

Oregon, began assisting in the investigation and in the identification of victims.

On February 6, FBI Special Agent Diana Kimes obtained a federal search warrant to take

photographs of Kowalczyk's body to compare with the photographs on the digital media.  She

described the sexually explicit photographs, the broadcasts of clean photographs by the media

which led to the discovery of the mother, the interview of the mother identifying Kowalczyk as a

person who had contact with her children, and the information from Detective Visnaw about the

watch.  Agent Kimes also described seeing moles on the body of the offender.   The pictures of

Kowalczyk's body were taken on February 7 by a female photographer, with a male investigator

directing, for approximately one hour in a Pierce County jail cell.  Agent Kimes and several

Pierce County officers were also present in the hallway outside the cell.

IX.    Warrantless Seizure of Mini-Storage Unit

On January 11, Detective Visnaw received an anonymous tip that Kowalczyk rented a

storage unit in Woodland, Washington.  Detective Visnaw asked Detective Mike Lewis to follow

up; the detective called a storage unit employee and confirmed Kowalczyk rented a unit under his

own name.  The employee could not say when Kowalczyk had last accessed the unit.  Detective

Lewis informed her that he would be getting a search warrant for the unit.  The employee agreed

to place a lock on the unit and requested that she be given a copy of the search warrant when it

was issued.

X.    ICE Search of Mini-Storage Unit

Special Agent Findley learned about the storage unit in mid-February.

On March 11, Special Agent Findley applied for and received a federal search warrant for

the storage unit rented by Kowalczyk in Woodlawn, Washington to search for evidence related to

Kowalczyk's production and possession of child pornography.  He was looking for items

depicted in some of the photographs found on Kowalczyk's computers.  He explained the delay

in obtaining a search warrant as being due to his office's prioritization of finding victims.

Although three of the victims named in the indictment had been located, officers feared there

Page 17 - OPINION AND ORDER ON MOTIONS FOR SUPPRESSION

were multiple perpetrators and that there may be additional children in danger. Special Agent

Findley testified that they have since identified other victims, even though Kowalczyk has not

been charged with conduct related to these other individuals.

## LEGAL STANDARDS

The legal standards are set forth at the beginning of each section for the reader's ease.

## DISCUSSION

I.    Traffic Stop

"An investigatory stop of a vehicle is reasonable under the Fourth Amendment if the

officer reasonably suspects that a traffic violation has occurred." United States v. Miranda-

Guerena, 445 F.3d 1233, 1236 (9th Cir. 2006). "'If the facts are sufficient to lead an officer to

reasonably believe that there was a violation, that will suffice . . . .'" Id. (quoting United States

v. Mariscal, 285 F.3d 1127, 1130 (9th Cir. 2002)). The subjective motives of the police are

irrelevant; all that matters is that the stop "not be unreasonable under the circumstances." Wren

v. United States, 517 U.S. 806, 810, 812 (1996).

Kowalczyk disputes that he was speeding or that he made a U-turn on a red light. I find

Sergeant Bell's testimony credible and corroborated by the patrol vehicle's video recording.

First, Sergeant Bell reported observing the Lincoln traveling 55 to 60 in a 45 mph zone.

Kowalczyk suggests that Sergeant Bell did not properly pace the speed because the police cruiser

had to pull out on the road from a complete stop, but Bell testified that the driver was "traveling"

in the same direction as he was. Tr. 38:10 (May 31, 2012). Kowalczyk also points to

RCW 46.61.470, arguing that the statute requires Sergeant Bell to have used a "certified,

calibrated speed-measuring device, with less than a 5% error rate to officially pace another

vehicle, and the vehicle must be paced for at least one-quarter mile." Pro Se Mem. 210; Def.'s

Post-Hr'g Br. 3. The statute, however, deals specifically with speed traps, specifying when a

driver caught in a speed trap may be prosecuted. State v. Ryan, 48 Wash. 2d 304, 306-07, 293

P.2d 399 (1956) (statute establishes criteria for speed trap; use of radar does not qualify).[12]

Washington courts have upheld stops where police paced the driver to determine the speed, so

long as the charged offense is not speeding. State v. Hamilton, 140 Wash. App. 1036, 2007 WL

2800119, at *1 (2007) (officer's testimony that he paced defendant exceeding the speed limit

sufficient to support stop when the offense to be proved is not speeding). Finally, although the

patrol video depicts the Lincoln not passing any other cars and remaining in the same lane until it

prepares to turn, the recording captured only the 30 seconds immediately prior to Sergeant Bell

activating his overhead lights. Sergeant Bell testified that he had been watching the Lincoln for

about one minute and maybe longer. Because I find Sergeant Bell's testimony to be credible, I

believe he saw the driver passing cars and speeding.

Additionally, the video recording and Sergeant Bell's testimony support Sergeant Bell

pulling the driver over for making a U-turn against a red light. Sergeant Bell testified that

Washington law does not allow a U-turn on a red light unless specifically marked otherwise. It is

true that Washington law allows safely executed U-turns. RCW 46.61.295(1). However,

"[w]hen lane-direction-control signals are placed over the individual lanes of a street or highway,

vehicular traffic . . . shall not enter or travel in any lane over which a red signal is shown." RCW

46.61.070. Further, "[v]ehicle operators facing a steady red arrow indication may not enter the

---

[12]The Ryan court addressed an earlier version of the statute, but it was recodified as RCW
46.61.470 with the same definition of "speed trap." State v. Randolph, 158 Wash. App. 1012,
2010 WL 4109283 (2010).

intersection control area to make the movement indicated by such arrow, and unless entering the

intersection control area to make such other movement as is permitted by other indications

shown at the same time, shall stop at a clearly marked stop line[.]"  RCW 46.61.055(3)(c).  The

video depicts a red light controlling the only left turn lane, which remains red as the driver makes

his U-turn and turns green when the officer follows the driver.[13]  Sergeant Bell could enforce the

prohibition against making a U-turn on a red arrow.

It is unclear from the testimony whether Sergeant Bell suspected the driver of hanging out

in a known prostitution area.  Sergeant Bell reported as much to Puyallup Police Officer Lien.

Additionally, Puyallup Police Sergeant Dan Pashon wrote on December 27, "Warrant

Arrest/Northwest Motor Inn.  Des Moines PD called wanting us to check the motel for a vehicle

that had led them on a vehicle pursuit after a prostitution stop in their city."  MTS-116.

However, I do not find these statements undermine Sergeant Bell's credibility; he explained in

his testimony that he may have heard about the prostitution concern from other officers.

Furthermore, Sergeant Bell's action in pulling the driver over for speeding and for making a U-

turn against a red light are sufficient to support the traffic stop.  "A traffic violation alone is

sufficient to establish reasonable suspicion."  United States v. Choudhry, 461 F.3d 1097, 1100

---

[13]The video recording is somewhat grainy.  Kowalczyk argues that the light controlling
his turn lane was not operating, even though the lights for the southbound lanes were red.  First
of all, the red arrow controls the only left turn lane, clearly marked by a painted arrow on the
street.  Sergeant Bell's testimony was somewhat confused on this point in that he could not
remember, given some traffic control changes at some point, whether there were two left turn
lanes.  The video speaks for itself, however, as does the officer's report which referred to "the
left turn lane."  MTS 102, at KOWAL01539.  Further, even if the light controlling one of two
left turn lanes was not operating, Washington law required Kowalczyk to come to a complete
stop, then yield to traffic as if it were a four-way stop.  RCW 46.61.183.  He rolled through the
intersection.

(9th Cir. 2006).  Any other thoughts that Sergeant Bell may have had are irrelevant.  Whren, 517

U.S. at 812.

 Kowalczyk makes the argument in his pro se brief that the show of officers resulted in an

arrest.  Only Sergeant Bell and Officer Bagsby, who happened to be in the area, were on the

scene at the traffic stop.  Contrary to the pro se suggestion, there is no evidence a gun was drawn.

Looking at the totality of the circumstances, under United States v. Del Vizo, 918 F.2d 821, 824

(9th Cir. 1990), the stop did not ripen into an arrest merely by the presence of two police cars at

the scene.

 The traffic stop was constitutional.

II. Arrest

 Kowalczyk concedes there are two possible grounds for probable cause to arrest him:  (1)

evidence that Kowalczyk was the person in room #122 who fled Des Moines officers eight hours

before;[14] or (2) evidence that Kowalczyk was the person in room #122 who had an Oregon felony

warrant out for him.  I find, based on the testimony and evidence adduced at the suppression

hearing, that officers had probable cause to arrest Kowalcyzk on either ground.

 A. Evidence Kowalczyk was the Driver who Eluded

 An arrest without a warrant is permitted when an officer has probable cause to believe the

---

 [14]In his pro se motion, Kowalczyk argues he was not eluding.  He claims he was only
traveling 66 mph, not 100 mph, based on his calculations.  The officers, and the radio dispatch
communications, support a finding that he was driving 100 mph.  MTS 353.  The statute
requires, as applicable here, driving a vehicle in a reckless manner while attempting to elude a
pursuing police vehicle.  RCW 46.61.024(1).  Reckless driving is driving any vehicle "in willful
or wanton disregard for the safety of persons or property[.]"  RCW 46.61.500.  Sergeant Bell
testified that doubling the speed limit–45 mph here–would be considered reckless driving under
this standard.

person has committed an offense.  Beck v. State of Ohio, 379 U.S. 89, 91 (1964).  Officers have

probable cause if, at the time of the arrest, "'the facts and circumstances within their knowledge

and of which they [have] reasonably trustworthy information [are] sufficient to warrant a prudent

man in believing' that the defendant committed an offense."  United States v. Rodgers, 656 F.3d

1023, 1028-29 (9th Cir. 2011) (quoting Hunter v. Bryant, 502 U.S. 224, 228 (1991)).

       I find that "the facts and circumstances within" Officer Kleffman's knowledge and of

which he had "reasonably trustworthy information" were "sufficient to warrant a prudent man in

believing" that Kowalczyk, the only occupant of room #122, was the driver who fled in violation

of Washington law, RCW 46.61.024.  I find this for the following reasons:  (a) the traffic stop

was lawful; (b) during the traffic stop, the driver said he was staying at the Northwest Motor Inn,

in Puyallup; (c) the same black Lincoln, with Washington plates 569 WNR, which eluded from

the traffic stop was found at the Northwest Motor Inn, in Puyallup, outside room #122; (d) a

motel employee informed the officers that the same black Lincoln belonged to the occupant of

room #122; (e) the registry for the occupant staying in room #122, although it was dated October

2 through October 9, 2007, was the current motel registry for the Lincoln's driver according to

the employee; (f) Puyallup officers obtained the motel registry with a picture of a driver's license

belonging to "Benny Mazzola;" (g) Puyallup officers discovered Benny Mazzola was an alias for

Andrew Kowalczyk, who had an active arrest warrant from Washington County, Oregon for

failure to appear on an Unlawful Use of a Weapons charge; (h) Puyallup officers obtained the

booking photograph for the Oregon charge; and (h) Sergeant Bell reviewed a facsimile of the

booking photograph and asserted with a 90% certainty that it pictured the driver.

       In response to defense counsel's and Kowalczyk's pro se arguments, I find it irrelevant

Page 22 - OPINION AND ORDER ON MOTIONS FOR SUPPRESSION

that Alex Craciun had sold the Lincoln to Benny Mazzola only "one or two months before," when the registry which identified the occupant as owning a "lincoln Blk" was dated three months before, because police relied on the motel employee's report that the Lincoln involved in the elude, with Washington plates 569 WNR, belonged to the occupant of room #122. Similarly, it is true that the black Lincoln was parked for all practical purposes in front of four additional motel rooms on the second and third floors. However, again, police relied on a motel employee who informed them that the black Lincoln involved in the elude belonged to the occupant of room #122.

Kowalczyk makes much of the poor quality black and white faxed booking photograph, the fact that Sergeant Bell admits the individual in the faxed booking photograph did not have facial hair, and the driver's hairstyle was different from the hairstyle depicted in the booking photograph, but that Sergeant Bell believed with a 90% certainty the booking photograph was the driver. I accept Bell's testimony, despite his highlighting the differences between the driver and the driver's license in his report, that he was sure it was the same person. He persuasively testified that the side profile of the booking photograph was particularly helpful, and that he could tell it was the same person by the structure of the face and nose. Indeed, Sergeant Bell's identification is corroborated by his later pick from a six-pack photo montage. I also accept his testimony that he made note of the booking photograph identification in his report contemporaneous with the actual identification, at 6:00 a.m. on December 27, even though he did not date the report until January 8 when he deemed his investigation complete.

On that note, I accept that Sergeant Bell communicated to Officer Bagsby, who informed the Puyallup police, that the driver of the vehicle matched the Washington County booking

Page 23 - OPINION AND ORDER ON MOTIONS FOR SUPPRESSION

photograph.  While it is puzzling that this conversation is not recorded on the CD containing the

Des Moines radio dispatch communications, no communications are captured after a report that a

tow for the Lincoln was on its way.  Sergeant Bell's contemporaneous report is comprehensive.

In it, he reports that he informed Officer Bagsby about the identification, and Officer Bagsby

responded that the tow was at the motel and he would be returning to the Des Moines police

department with the tow.  I have no reason to disbelieve Sergeant Bell.  No one asked Officer

Bagsby during the hearing if Sergeant Bell had communicated with him about the identification,

nor was there any question about why the dispatch recording did not contain the conversation

between them.  I have no reason to believe that Officer Bagsby would not have relayed the

identification to Puyallup officers while he was at the motel.  Moreover, the "collective

knowledge" of officers engaged in the same investigation may be considered in determining

whether Officer Kleffman had probable cause to arrest Kowalczyk.  United States v. Bernard,

623 F.2d 551, 560 (9th Cir. 1980).

Kowalczyk argues Sergeant Bell applied for a search warrant, after he purportedly

identified Kowalczyk as the driver, to search the Lincoln for "physical evidence/information that

would lead to the identification of the driver of the vehicle at the time of this incident and any

additional evidence that would establish ownership of the vehicle."  MTS-106, at 2.  Given the

number of different names the driver and motel occupant had used, it was reasonable for the Des

Moines officers to want confirmation of the driver's identity.  Even after someone is in custody,

as Sergeant Mohr testified, the officers still need evidence that the driver had dominion and

control over the car.  Seeking a search warrant to obtain additional evidence of the crime does

not undermine Sergeant Bell's identification.

Page 24 - OPINION AND ORDER ON MOTIONS FOR SUPPRESSION

Kowalczyk adds that at 6:51 a.m., Des Moines police informed Puyallup officers that "[a]ll they wanted is the car." MTS-130, at 88. He believes the inference is that Des Moines police did not have probable cause to arrest Kowalczyk. Sergeant Bell testified, however, that Des Moines had probable cause to arrest, but did not do so solely because he knew the Des Moines charge would trail along with the Oregon warrant. Further, when Officer Kleffman, arrived at the scene, the night shift officer told him that Des Moines had probable cause to arrest. Finally, there were repeated references to Des Moines having probable cause on the Des Moines dispatch recording.

Kowalczyk points out that Officer Bagsby was at the motel to impound the Lincoln at 4:28 a.m. and did not arrest Kowalczyk as a suspect at that time. Although there was no explanation for why Puyallup officers sat on the scene undertaking surveillance of the motel, rather than breaking down the door and taking defendant into custody once Sergeant Bell identified him, there is no reason to punish officers for taking the more conservative route of maintaining surveillance and effectuating a valid public arrest. E.g., United States v. George, 883 F.2d 1407, 1412 (9th Cir. 1989) (describing limited circumstances allowing warrantless entry into an apartment).

Defense counsel argues that the description given to Officer Kleffman was too vague and "would match countless thousands of people in the area at any given moment." Def.'s Op. Mem. 25 (citing Grant v. City of Long Beach, 315 F.3d 1081 (9th Cir. 2002) (mere resemblance to general description is not enough to establish probable cause)). Here, however, the occupant of room #122 stepped out and he generally matched the description given by Sergeant Bell and Officer Bagsby, supplemented by Craciun's description of "Walter George." Although the

Page 25 - OPINION AND ORDER ON MOTIONS FOR SUPPRESSION

description may have been vague, the fact that the same car involved in the elude was parked in front of room #122, at the very motel where the driver said he was staying, that the motel's employee and registry connected room #122 with the black Lincoln, that there was only one occupant of room #122, that Sergeant Bell was 90% certain that the booking photograph matched the driver, and that Puyallup officers believed the booking photograph matched the driver's license on file at the motel, the officers had probable cause to arrest the occupant of #122.  This is not probable cause based solely on a general description of a perpetrator.  Officer Kleffman had probable cause to arrest Kowalczyk for committing the felony offense of eluding an officer.

B.    Kowalczyk was Wanted on an Oregon Failure to Appear Warrant

Alternatively, evidence at the hearing demonstrated the Puyallup officers were able to objectively conclude that the person in room #122 was Kowalczyk, who had an Oregon felony arrest warrant, before they arrested him.  "Benny Mazzola" was found in a police database as being an alias for Kowalczyk, who had an outstanding Oregon felony warrant.  Officers had a booking photograph of Kowalczyk from Pierce County.  The pictures from the Oregon warrant and the Pierce County charge matched the Benny Mazzola driver's license.  Finally, before he arrested Kowalczyk, Officer Kleffman confirmed that the motel room occupant was Kowalczyk by asking him.  As a result, despite differing physical descriptions, the arrest was based on photographs that matched–the "Benny Mazzola" at the motel registry and the booking photographs from Washington County and Pierce County–and a verification of identity before arrest.

Kowalczyk argues that Puyallup officers failed to confirm that the Oregon warrant was valid before arresting him.  State v. O'Cain, 108 Wn. App. 542, 31 P.3d 733 (2001); State v.

Sinclair, 11 Wn. App. 523, 523 P.2d 1209 (1974).

There is no evidence any officer formally confirmed the warrant until after they arrested Kowalczyk, although Puyallup communicated with the Beaverton police department about the warrant and obtained a booking photograph.  However, even if no officer confirmed the warrant, under federal law, the police may "stop" or detain a defendant to confirm his identity.  In United States v. Hensley, 469 U.S. 221, 229 (1985), the Court permitted officers to "briefly stop that person, ask questions, or check identification" if they suspect involvement in a past crime.  In that case, the Supreme Court upheld a stop, at gunpoint, for the officer to check identification of a driver who matched a felony "wanted flyer" from a neighboring police department.  The Court held that "evidence uncovered in the course of the stop is admissible if [1] the police who *issued* the flyer or bulletin possessed a reasonable suspicion justifying a stop, and [2] if the stop that in fact occurred was not significantly more intrusive than would have been permitted the issuing department."  Id. at 233; see also Sinclair, 523 P.2d at 1213 (police officer may detain a person he reasonably suspects has an arrest warrant outstanding against him).

Kowalczyk raises pro se the question of whether the warrant was properly issued (the first prong of Hensley), but even if there were any issue with the underlying warrant–which I doubt– because the officers relied in good faith on the outstanding arrest warrant, the arrest is not subject to the exclusionary rule.  See Herring v. United States, 555 U.S. 135 (2009); but cf. O'Cain, 31 P.3d at 737-38 (no evidence sufficient to support the stop at a suppression hearing, although police were permitted to act on the information).

Kowalczyk also questions the intrusiveness of the "stop."  Officers are entitled to "take reasonable measures to neutralize the risk of physical harm and to determine whether the person

in question is armed." Del Vizo, 918 F.2d at 825 (citing numerous case for the proposition that "holding a suspect at gunpoint does not necessarily convert an investigatory stop into an arrest").

Officer Kleffman, the only officer at the scene during the stop, testified that he pointed his gun at the low-ready position, while Kowalczyk was on his belly with his hands overhead. He could have raised his gun in an instant should Kowalczyk have resisted arrest. Officer Kleffman also testified that he had been told a valid warrant was out for Kowalczyk's arrest, he also knew about the underlying firearms charge, that Kowalczyk was deemed "armed and dangerous" and an escape risk, and that he had been known to carry a .45 caliber handgun.[15] Further, Officer Kleffman knew Kowalczyk had earlier eluded police and had refused to open his door or answer his phone when contacted by police, indicating an unwillingness to cooperate with authority.[16] Officer Kleffman pointed a gun, demanded that the room's occupant lie face down, and confirmed that the man was Kowalczyk. I find not credible Kowalczyk's testimony that when Officer Kleffman asked him, "Are you Kowalczyk?," he refused to answer.[17] Given the very

---

[15]Kowalczyk's pro se contention that the underlying charge involved a paint gun is irrelevant, as there is no evidence Officer Kleffman knew about the circumstances of that charge and the "collective knowledge" doctrine applies only to those officers involved in the same investigation. Bernard, 623 F.2d at 560. Further, the police report from the February 2007 incident, which he put into evidence, reflects that two of three witnesses thought Kowalczyk was carrying a "black hand gun," perhaps "the size of a 45 caliber semi automatic," although the third witness was not sure if the gun was real or not. MTS-200.

[16]Defense counsel suggests an alternate reading of this fact–that officers were not concerned about Kowalczyk and approached his door heedlessly. There is no evidence, however, that the officers did not exercise all reasonable protective measures in approaching the motel door. Nor is an elude that occurred only hours before so attenuated as to undermine Officer Kleffman's reasonable desire to neutralize the risk of harm.

[17]Kowalczyk's testimony was, on the whole, not credible. He reported, for example, that he was considering going back to Oregon to turn himself in, after he eluded Des Moines police.

(continued...)

short time period of stop to arrest (a matter of seconds), I conclude Officer Kleffman's actions constituted a <u>Terry</u> stop.

Alternatively, the government cites multiple cases in support of the proposition that an officer may arrest on an NCIC warrant. <u>See, e.g.</u> <u>Case v. Kitsap Cnty. Sheriff's Dept.</u>, 249 F.3d 921, 928 (9th Cir. 2001) (in a case arising out of a Washington arrest on an Oregon warrant, "[t]here is a long line of cases from this and other circuits that an 'NCIC hit,' although not definitive in terms of conviction, has been routinely accepted in establishing probable cause for a valid arrest").

Finally, I reject Kowalczyk's pro se argument that Officer Kleffman timed the arrest so as to ensure himself the opportunity to search the bags Kowalczyk was carrying. Despite police repeatedly pounding, calling, and directing Kowalczyk to open up his motel room door and come out, he refused to do so. When Kowalczyk first appeared that morning from his motel, prepared to take a taxi away from the motel, Officer Kleffman arrested him. There is no evidence of pretext or subterfuge.

The government has met its burden by a preponderance of the evidence; the arrest was constitutional.

III.    <u>Cursory Search of Motel Room</u>

Kowalczyk disputes that officers had any reason to protectively sweep his motel room.

---

[17](...continued)
He then testified that when Washington police were knocking on his door to come out, he did not respond because he "was sleeping, didn't feel well, I had a very bad headache – I have migraines – and I just didn't feel like it at the time." Tr. 155:6-8 (June 6, 2012). Similarly, when he called the taxi cab, he was in a hurry to get out of the motel–not because he did not want to run into Washington law enforcement, but because he wanted to "leave that morning . . . to go back to take care of this FTA." <u>Id.</u> at Tr. 159:6-7.

Page 29 - OPINION AND ORDER ON MOTIONS FOR SUPPRESSION

Defense counsel argues this is an intervening illegality between the time of the arrest and the search incident to arrest, and for that reason is relevant to the search incident to arrest challenge described below.

Immediately after an arrest, officers may conduct (1) a "protective search 'incident to arrest' to protect the arresting officers from the danger of a surprise attack . . . without reasonable suspicion or probable cause" if the searched area adjoins the area of arrest and if "an attack could be immediately launched" from the area; or (2) officers have "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbor[ed] an individual posing a danger to those on the arrest scene." United States v. Lemus, 582 F.3d 958, 963 (9th Cir. 2009); Maryland v. Buie, 494 U.S. 325, 327 (1990).

I need not analyze whether officers had "articulable facts" which would make Puyallup officers believe that the motel room "harbored" a dangerous person because I agree with the government that Puyallup officers could search the motel room without reasonable suspicion or probable cause as an area adjacent to arrest from which a surprise attack could occur. When Officer Kleffman arrested Kowalczyk right outside the motel room door, the officer could not see all the way inside the room, including in the back bathroom, and he had learned about officers who had been injured in similar circumstances when they had not undertaken a cursory search. The door was open. The officers went in very quickly, did not touch anything, did not open any drawers, and looked only for individuals who may be hiding in the room. The motel room was adjacent to the arrest location. Lemus, 582 F.3d at 963-64 (citing cases upholding similar searches of adjacent spaces even when individual was arrested outside). The cursory search was

Page 30 - OPINION AND ORDER ON MOTIONS FOR SUPPRESSION

undertaken solely for the purpose of looking for people hiding in the room.  Although Officer

Kleffman estimated the search took less than two minutes, dispatch records reflect it took less

than one minute.  The officers' cursory search of the motel room to ensure no other person was

hiding in the room, without reasonable suspicion or probable cause, was constitutional under the

first prong of Buie.

In response to Kowalczyk's pro se argument, all of the items viewed by the officers were

seen by Detective Visnaw from outside the room in a plain view search through the open door.

As a result, Detective Visnaw properly included his observations in the search warrant affidavit

to search Kowalczyk's motel room.

The cursory search was constitutional.

IV.    Search of Luggage Outside Motel Room

  A.    Search Incident to Arrest

It is the government's burden to show that a warrantless search is reasonable and within

the strictures of the Fourth Amendment.  Katz v. United States, 389 U.S. 347, 357 (1967).  A

search incident to arrest is lawful to find weapons and to protect evidence an arrestee might hide

or destroy.  Chimel v. California, 395 U.S. 752, 762-63 (1969).  A search "may be conducted

shortly after the arrestee has been removed from the area, provided that (1) the search is restricted

to the area that was 'within the arrestee's immediate control when he was arrested,' and (2)

events occurring after the arrest but before the search incident to arrest did not render the search

unreasonable."  United States v. Hudson, 100 F.3d 1409, 1419 (9th Cir. 1996) (quoting United

States v. Turner, 926 F.2d 883, 888 (9th Cir. 1991)).  Additionally, "we have also held that a

search incident to arrest may justify the opening of containers found within the physical area

Page 31 - OPINION AND ORDER ON MOTIONS FOR SUPPRESSION

covered by the search."  Id.; United States v. Andersson, 813 F.2d 1450, 1456 (9th Cir. 1987)

(search incident to arrest in a hotel room could encompass the whole room and a closed suitcase).

For purposes of this argument, defense counsel highlights the following facts:

1. Officer Kleffman forced Kowalczyk to the ground at gunpoint, on his belly and hands above him, at 8:19:06.  All units slowed at 8:19:35.

2. Officers handcuffed Kowalcyzk, and dispatch reflected Officer Temple "has one in custody" at 8:19:40.

3. Officer Pihl arrived.  Officer Pihl watched officers bring Kowalczyk to his feet and assisted in escorting Kowalczyk to the back of Officer Temple's police car. The arrest occurred "without incident."  MTS-112, at 10.

4. Officer Pihl provided Kowalczyk with his Miranda warnings.  Kowalczyk invoked his right to remain silent.

5. Officer Pihl left Kowalczyk in the police car.  Officer Pihl stood on the scene and noticed two large pieces of luggage and a backpack in the area of arrest.  Officer Pihl told Officer Kleffman that Kowalcyzk had invoked his rights.

6. Officer Pihl watched as Officer Kleffman began to search the luggage and located suspicious, fraud-related items, including inside a file box and inside a toiletries bag.

7. Officer Pihl agreed to check inside the last piece of luggage for "evidence of fraud."  He located a digital camera, turned it on, and found the child pornography.

8. No one found a gun and none has been located to this day.

As an initial matter, the government concedes that Officer Pihl's search of the camera

exceeded the scope of the search incident to arrest, although they argue the images would have

been inevitably discovered.  I address this argument below.

The first question, then, is whether the bags were within Kowalczyk's immediate control

when he was arrested.[18]    Officer Kleffman's version of events is important given that he was the

first officer on the scene, had the only view of the occupant just before the arrest, and held

Kowalczyk at gun point before a back-up officer arrived.    However, given that his police report

was unclear in identifying the luggage on the scene, and that the events occurred almost five

years ago, I also rely on Officer Pihl's report and testimony to clarify Officer Kleffman's version

of events.    Officer Kleffman's police report indicates he conducted a "[s]earch incident to arrest

of subject's property that was with him at time of arrest[.]"  MTS 110, at KOWAL00015.  He

does not specifically describe the "property," other than making a reference to a "black duffle

bag."  Id.  Officer Kleffman gave his clearest testimony on redirect, at which time he explained

he saw the occupant carrying "a black duffle bag *and/or* a suitcase" and a black backpack.  Tr.

158:11-13 (May 31, 2012) (emphasis added).  Officer Pihl's police report clearly identified "two,

large nylon type luggage bags and a black backpack . . . on the ground where Kowalczyk had

been arrested outside of his motel room."  MTS-111, at KOWAL00019.  His testimony is

consistent with his report.  Tr. 255:2-5 (May 31, 2012).  Officer Kleffman personally searched

two bags–one duffle bag and one backpack–which is likely why he remembers those two bags

most clearly.  Officer Pihl searched the other piece of luggage on the ground where Kowalczyk

had been arrested.  Officer Kleffman explained that the taxi driver unloaded some additional

bags; he testified that he did not search those bags, but did not know whether anyone else had

---

[18]Defense counsel seems to suggest that the emphasis has switched to whether the
property was within the arrestee's control at the time it was *searched*, Def.'s Op. Mem. 31 (citing
Arizona v. Gant, 556 U.S. 332 (2009)), but the law remains clear with respect to a search of the
immediate area of an arrestee that the inquiry is whether the item was within the control of the
arrestee at the time of *arrest*.  U.S. v. Maddox, 614 F.3d 1046, 1048 (9th Cir. 2010) (key chain
within immediate control when he was arrested, but subsequent events rendered search
unreasonable).

searched them.[19]  Based on this evidence, I find the searched luggage–two nylon type luggage bags (perhaps one being a duffle bag) and a black backpack–was within Kowalczyk's immediate control when he was arrested.[20]

In contrast, Detective Visnaw's report is not clear about what was searched, during the hearing his memory of events was poor, he could not remember who searched what bags, and he could not "look at a piece of luggage sitting on this floor and tell you that it was one of the pieces that was searched."  Tr. 365:23-24 (June 1, 2012).  He testified inconsistently about whether officers went through all the luggage in the parking lot or not.  Compare 366:12-18 with 369:1-3.  His recollection of the search incident to arrest is not reliable.

Defense counsel's main argument is that Kowalczyk was safely confined in the back of the police car while the search of his luggage occurred; as a result, he argues, events after the arrest but before the search rendered it unreasonable.  He relies on United States v. Chadwick, 433 U.S. 1, 15 (1977) (internal citations and quotations omitted), abrogated on other grounds by California v. Acevedo, 500 U.S. 565 (1991), which held:

> Warrantless searches of luggage or other property seized at the time of an arrest cannot be justified as incident to that arrest either if the search is remote in time or place from the arrest or no exigency exists.  Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger

---

[19]This is contrary to Officer Kleffman's testimony on cross-examination, appearing to indicate that all the bags had been searched in the parking lot, but the question was a compound question.  Tr. 195-196 (May 31, 2012).

[20]Kowalczyk wants a description of the luggage searched on the scene.  I have no way to differentiate the bags.  I can only say the three bags described by Officers Kleffman and Pihl can be identified by the contents they describe–in their testimony and reports–finding in each bag.  The government intends only to use evidence from these bags, which is consistent with Kowalczyk's report that he consolidated all questionable items.

that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search is no longer an incident of the arrest.

In Chadwick, officers had seized a footlocker and searched it more than an hour after the arrest, after the federal agents had obtained exclusive control over it, and after the suspects were in custody. Defense counsel also relies heavily on a recent Ninth Circuit case, United States v. Maddox, 614 F.3d 1046, 1048 (9th Cir. 2010). Defense counsel argues that the unconstitutional searches mean that all of the evidence derived from the illegality must be excluded. Wong Sun v. United States, 371 U.S. 471, 484 (1963).

Although it is a very close call, I find the search incident to arrest was valid even though Kowalczyk was handcuffed and removed from the immediate area. See Turner (defendant handcuffed and removed from room; .45 caliber found beneath him in bed); Hudson, 100 F.3d at 1419-20 (defendant handcuffed and removed from room, officers conducted protective sweep before engaging in search).[21]

Here, Kowalczyk was seen leaving his motel room carrying bags. He made several trips. At the time of his arrest, he was carrying two large duffle bags and a backpack. The luggage remained on the ground, at the location of his arrest. Officers searched the bags less than a minute later, after conducting a cursory search of the motel room, while defendant was on the scene in the back of the police car. Just as in Turner, officers "did not take him far away or delay for long before conducting the search." 926 F.2d at 888. The search was not distant in time or

---

[21]I do not consider Arizona v. Gant, 556 U.S. 332, 129 S. Ct. 1710, 1716 (2009) to be relevant to this discussion. The case involved a change to the automobile exception, under New York v. Belton. The Ninth Circuit has not ruled on whether Gant applies to searches other than vehicle searches. Similarly, I find the government's citation to United States v. Tank, 200 F.3d 627, 629, 631-32 (9th Cir. 2000) (search of a backpack in defendant's car) and United States v. McLaughlin, 170 F.3d 889, 891-93 (9th Cir. 1999) (search of defendant's car) unhelpful here.

space from Kowalczyk's arrest.

Furthermore, the case is distinguishable from <u>Maddox</u> in that, as in <u>Turner</u> and <u>Hudson</u>, the officers had a "legitimate concern for [their] safety." <u>Maddox</u>, 614 F.3d at 1048. As <u>Maddox</u> instructed, "Mere temporal or spatial proximity of the search to the arrest does not justify a search; some *threat* or exigency must be present to justify the delay." <u>Id.</u> (emphasis added). Here, the officers had an objective basis to believe that Kowalczyk actually possessed a firearm, and Officer Kleffman initially believed Kowalzcyk was not going to comply with his request to lie down. Indeed, Kowalczyk had eluded police just hours before, after giving a false name, a felony warrant was outstanding with an underlying firearms charge, he had an armed and dangerous alert, officers believed he was carrying a .45 caliber handgun, and the bags were large enough to conceal a weapon. The officers testified that they were concerned about a firearm being in the luggage, including inside the file box. As a result, it was reasonable for officers to take him into custody, handcuff him, put him in the police car, engage in a very short cursory search of the motel room, and search the bags. In sum, I cannot say that officers had no legitimate concern for their safety because here, unlike in <u>Maddox</u>, officers had sufficient information to be concerned about the "threat" of a firearm. The officers acted entirely reasonably in handcuffing Kowalczyk and placing him in the police car, for their own safety, before searching the bags.

Finally, frankly, the case law is sufficiently complicated in this area that Kowalczyk's pro se efforts serve only to muddy the waters. He cites <u>United States v. Gooch</u>, 6 F.3d 673 (9th Cir. 1993), but the case did not evaluate the constitutionality of any search incident to arrest since it held there was no valid arrest in the first place. The automobile search cases are, similarly,

unhelpful.  See United States v. Lorenzo, 867 F.2d 561 (9th Cir. 1989) (per curiam); United States v. Weaver, 433 F.3d 1104 (9th Cir. 2006).  However, he does cite United States v. Vasey, 834 F.2d 782, 786-87 (9th Cir. 1987).  In that case, the court concluded that the search was not limited to the area within the arrestee's immediate control because he was handcuffed and located in the rear of a police vehicle when the search occurred.  Notably, however, the search occurred thirty to forty-five minutes after the arrest, following several conversations with the police, and no threat or concern about firearms is discussed.  I find it distinguishable for these reasons.

The government has met its burden by a preponderance of the evidence of showing that the search incident to arrest, with the exception of the camera, was reasonable.  Furthermore, subsequent searches of the luggage at the police property room were permissible.  United States v. Burnette, 698 F.2d 1038, 1049 (9th Cir. 1983) ("[W]e hold that once an item in an individual's possession has been lawfully seized and searched, subsequent searches of that item, so long as it remains in the legitimate uninterrupted possession of the police, may be conducted without a warrant.").

B.    Inevitable discovery

In any event, even if the search incident to arrest were unconstitutional, the government argues the evidence would have been inevitably discovered in an inventory search.  The government's burden in this context is preponderance of the evidence.  United States v. Reilly, 224 F.3d 986, 994 (9th Cir. 2000).  The court must rely on "demonstrated historical facts capable of ready verification and impeachment" in order to find that evidence illegally obtained would have been inevitably discovered through lawful means.  United States v. Young, 573 F.3d 711, 722 (9th Cir. 2009).

An acceptable "inventory search must conform to a standardized and established local procedure, and must be motivated by a 'concern to inventory [the items] rather than to search for other incriminating evidence.'" United States v. Bowhay, 992 F.2d 229, 230 (9th Cir. 1993). An unwritten policy is acceptable. United States v. Mancera-Londono, 912 F.2d 373, 375 (9th Cir. 1990) (inventory search procedures need not be written, merely standardized to guide officer in exercise of discretion).

Here, Officers Kleffman and Pihl testified that after Kowalczyk was arrested, had they not searched the three bags incident to arrest, the bags would have been collected and taken into storage in the Puyallup Police Department. Puyallup police did not have a written inventory policy applicable in these circumstances. Instead, the standard and established procedure was to inventory the contents of any bag to check for contraband, valuables, and weapons. Indeed, Officer Kleffman testified, "knowing that he'd been in possession of a .45 handgun before, I need to make sure that the items are inventoried to protect myself and him." Tr. 168:9-11 (May 31, 2012). Similarly, Officer Kleffman explained that, not knowing whether a firearm was in one of the bags, and not knowing the condition such a firearm might be in, "there is a potential that it accidentally goes off and could injure or harm not just someone in the community, but other officers or evidence techs." Id. at Tr. 171:4-7. The bags were on the sidewalk adjacent to the motel parking lot and no one was available to take custody of them. In these circumstances, both Officers Kleffman and Pihl testified they would have taken the bags back to the property room and inventoried the contents before booking them into the property room.[22] This is consistent

_____

[22]Detective Visnaw testified similarly that if the bags had not been searched at the scene, they would have been collected and booked into the property room after completing an inventory
(continued...)

with federal law. <u>Illinois v. Lafayette</u>, 462 U.S. 640, 648 (1983) ("not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures"); <u>United States v. Ramirez</u>, 378 Fed App'x 727, 729 (9th Cir. May 10, 2010) (agents not required to leave bag with motel's custodian); <u>South Dakota v. Opperman</u>, 428 U.S. 364, 376 n.10 (1976) (consent not required); <u>cf.</u> <u>United States v. Monclavo-Cruz</u>, 662 F.2d 1285, 1289 (9th Cir. 1981) (where no reason to believe purse contained weapons, police should inventory as a unit).

There is some question about whether Washington law applies, as opposed to just the local Puyallup police procedures. For example, in <u>Maddox</u>, the court noted "[v]ehicular inventory searches must be conducted 'in accordance with the standard procedures of the Washington State Patrol' in order for procured evidence to be admitted in federal court." 614 F.3d at 1049 (quoting <u>United States v. Wanless</u>, 882 F.2d 1459, 1463 (9th Cir. 1989) (Washington State Patrol's procedures constituted the "standard procedures of the local police department")); <u>see also</u> <u>United States v. Johnson</u>, 936 F.2d 1082, 1084 (9th Cir. 1991) (per curiam) (evaluating Washington law because the unwritten policy permitted "inventory searches to the extent allowed by Washington law").

If I must evaluate the inventory search under Washington law as well, it appears the

---

[22](...continued)
search. Tr. 351:12-13 (June 1, 2012). He testified that a property report would itemize valuable property. Somewhat contrary to the other officers, he also testified that typically he would open up the luggage before he placed it in his police car, although, again, he testified inconsistently about whether police opened all the bags in the parking lot. Regardless, like the other officers, he confirmed that the items would have been inventoried at the station. <u>Id.</u> at Tr. 411:24. <u>See</u> <u>Florida v. Wells</u>, 495 U.S. 1, 4 (1990) ("there is no reason to insist that [inventory searches] be conducted in a totally mechanical 'all or nothing' fashion.").

inventory search of Kowalczyk's luggage was permissible.  "A police inventory of an arrestee's possessions presents no problem when a person is arrested in some public place while carrying a suitcase or like object, for it would be clearly improper for the police to simply leave the container unattended at the scene of the arrest."  State v. Dugas, 109 Wash. App. 592, 36 P.3d 577, 580 (2001).  The reason for this is that "[k]nowledge of the precise nature of the property protects against claims of theft, vandalism, or negligence."  Id.  Accordingly, in that case, the police could properly impound a jacket for safekeeping found at the time of arrest.  While the court held the police were not permitted to open a closed container found in the jacket to search for illegal drugs in the field, it based its conclusion on the fact, among others, that there was "no indication of dangerous contents."  Id. at 599.  Further, police testified that their standard inventory procedure permitted a search for illegal drugs, which was outside the scope of a valid inventory search.  Those circumstances do not exist here.  See also Bowhay, 992 F.2d at 230 (no discussion of need to obtain consent or need to impound backpack as a whole unit in this Washington case).

Kowalczyk contends Puyallup's impound policy applicable to cars is the closest applicable written policy, and appears to provide more protection than does the Puyallup Police Department's unwritten policy applicable to the luggage they seized here.  The written impound policy provides, "If an officer suspects contraband inside a specific suitcase, duffle bag or other locked container, the article should be removed from the vehicle and logged into the police department property room pending a search warrant."  MTS-325B (Policy 35.6.07).  As an initial matter, there was no vehicle impound here.  Furthermore, it is not for me to question the Puyallup Police Department's varying inventory policies.  It appears to me, however, that the

written policy applicable to luggage found in an impounded car complies with Washington state law specific to that context.  See State v. Houser, 95 Wash. 2d 143, 154-58, 622 P.2d 1218 (1980) (closed piece of luggage in a vehicle gives no indication of dangerous contents, an officer cannot search the contents of the luggage in the course of an inventory search unless the owner consents).  Policy considerations support an impound policy of this sort to account for a variety of circumstances, such as a car accidents, disabled cars, cars blocking intersections, abandoned cars–circumstances which do not necessarily involve an arrested individual.

In a pro se argument, Kowalczyk asserts that since the police were storing the baggage in a secured location, made for contraband, there was no reason the police had to inventory to ensure they did not introduce contraband to the secure location.  Officer Kleffman credibly testified that, for the protection of people entering the room, a proper inventory to find dangerous weapons must be undertaken.

Finally, Kowalczyk argues officers displayed no indication they were inventorying the items in the bags.  He turns repeatedly to the property sheet, which lists items of "evidence" and suggests the way in which the search took place in the property room indicates that officers' main motivation was investigatory.  The testimony and exhibits about what the officers actually did with the luggage once they took it to the property room is of limited assistance.  Of course, according to Officers Kleffman and Pihl, they had already searched three of the bags in the motel parking lot as a search incident to arrest, so their treatment of those bags cannot undermine their assertions that they would have inventoried those bags as a matter of course anyway.  See Burnette, 698 F.2d at 1049 (once property lawfully seized and searched, subsequent searches of that item are not unreasonable).

Page 41 - OPINION AND ORDER ON MOTIONS FOR SUPPRESSION

However, the way in which the officers treated the other bags collected from the cab is relevant to whether they had a standard inventory policy. Officer Kleffman could not remember sorting through the bags in the property room. Detective Visnaw testified that he took the luggage to the property room for "both" safekeeping and as evidence. Tr. 366:20-25 (June 1, 2012). He testified that he listed valuable items on the property report (e.g. "$180) and identified the "items for safekeeping" to include the luggage and their contents. Id. at Tr. 352-53; MTS 119-C. He did not believe that anything remaining in the luggage was of value. Sherie Theuerkauf, a civilian evidence technician responsible for safekeeping and storage of evidence, who assisted the officers with the luggage that day, incorrectly believed she was assisting in sorting through property pursuant to a search warrant. Detective Visnaw credibly testified that the December 27 search warrant covered only those items obtained from the motel room, however.

In the end, I am not persuaded that any of these facts undermine the officers' testimony about what they would have done had they not searched the luggage incident to arrest. Even if Detective Visnaw treated as "evidence" items he obtained from one of the previously unsearched bags, he reported that he transported the bags to the property room for "both" evidence and safekeeping. Tr. 366:20-25 (June 1, 2012). This is sufficient. Bowhay, 992 F.2d at 231 ("In this case, the department's policy was to search everything; the officer had no discretion. Because of this, the presence of an investigative motive does not invalidate the inventory search."). The search was a valid inventory search.

The images on the camera, which the government concedes were not properly searched as an incident to arrest and would not have been viewed pursuant to an inventory search, would

inevitably have been discovered as a result of the January 4 search warrant anyway. Indeed, Detective Visnaw proceeded as though the images were not properly viewed; he carefully excluded the camera from the January 3 warrant and only included it in the January 4 warrant when Investigator Clark learned about the presence of child pornography on the Acer laptop. Suppression of the images is not appropriate in these circumstances, whether under an inevitable discovery analysis or due to the attenuated connection between the illegality and the discovery of the images. See Gov't Suppl. Resp.53-57 and cases cited therein.

The government has demonstrated by a preponderance of the evidence that the evidence would have been discovered during an inventory search.

V.     Motel Room Search Warrant

The motel room warrant covered only items remaining in the motel room.

Kowalczyk's argument boils down to a request that the Court delete references to the materials discovered in the search incident to arrest, which leaves insufficient probable cause to search the motel room. Since I have found the search incident to arrest, or alternatively the inventory search, to be constitutional, I reject this argument.

VI.    Search Warrant for Digital Evidence

Kowalczyk complains that the January 3 warrant was tainted by the evidence found in the search incident to arrest. I reject this argument on the basis that I have concluded the search incident to arrest, or the inventory search, was constitutional.

Defense counsel also argues that the delay between seizure and issuance of the January 3 warrant was unconstitutional. A warrantless seizure of property is reasonable for a "time period . . . no longer than reasonably necessary for police, acting with diligence, to obtain the warrant."

Page 43 - OPINION AND ORDER ON MOTIONS FOR SUPPRESSION

Illinois v. McArthur, 531 U.S. 326, 332 (2001); see also United States v. Dass, 849 F.2d 414,

415 (9th Cir. 1988) (unreasonable delay and failure to act with diligence violates Fourth

Amendment; finding delays of seven to twenty-three days unreasonable).[23]  "[T]he

reasonableness determination will reflect a careful balancing of governmental and private

interests." Soldal v. Cook County, 506 U.S. 56, 71 (1992).  Defense counsel suggests there was

no reasonable explanation for a delay in obtaining a search warrant; the seizure occurred on

December 27 and a search warrant was not obtained until January 3.

    The delay occurred as follows:  the items were seized on Thursday, December 27,

December 29 was a Saturday, December 30 was a Sunday, December  31 was a Monday, and

New Year's Day was a Tuesday.  Although Kowalczyk reads work records as reflecting that

Detective Visnaw was working on the 27th, 28th, 29th, January 1, 2, and 3, Detective Visnaw

testified that of those days he only worked the 27th, the 28th, and January 2.  One of the exhibits

which seems to show him working (MTS-132) actually shows him logging into the computer and

checking his email from home.  He also was called at home and asked to come in on one of the

dates he was scheduled for vacation.

    I find the delay to be unfortunate, but reasonable under the totality of the circumstances.  I

recognize defense counsel provided authority that a Pierce County Judge could be reached 24

hours a day, including weekends and holidays, and that Puyallup police obtained warrants for

other cases on that Saturday and Sunday.  However, Detective Visnaw, the detective in charge of

---

    [23]Kowalcyzk argues pro se that the proper test is set out in Illinois v. McArthur, 531 U.S.
326, 330 (2001), which identifies a four-part test to evaluate the delay in obtaining a warrant to
search a residence.  A recent unpublished decision from the Ninth Circuit confirms that the delay
in searching seized computers is governed by Dass.  United States v. Grummer, No. 10-50403,
2012 WL 2951518 (9th Cir. July 20, 2012).

this investigation, was on scheduled days off, including over the weekend and a holiday.  United

States v. Gill, 280 F.3d 923, 929 (9th Cir. 2002) ("Nor is it insignificant that the investigation

began the end of one week and was completed at the beginning of the following week.")  There

was no evidence Detective Visnaw acted in bad faith in delaying obtaining a warrant.  Moreover,

since Kowalczyk was in custody, there was no evidence that withholding access to his computers

and other digital evidence was prejudicial; he had no serious possessory interest at stake.  See

Segura v. United States, 468 U.S. 796, 813 (1984) (plurality opinion); see also United States v.

Aldaz, 921 F.2d 227, 230-31 (9th Cir. 1990) (six day detention of mail packages not

unreasonable); cf. United States v. Mitchell, 565 F.3d 1347 (11th Cir. 2009) (21-day delay in

obtaining search warrant was unreasonable under all the circumstances; owner was deprived of

his computers, but agent felt no urgency).

VII.    Search Warrant for Child Pornography

        Kowalczyk complains again that the January 4 warrant was tainted by the evidence found

in the search incident to arrest.  Since I have upheld the search that formed the evidentiary basis

for the warrant, I reject this argument.

        He separately argues that the warrant is based on evidence obtained by Investigator Clark

who went  beyond the scope of the January 3 warrant.  He questions whether Investigator Clark

actually "stumbled" over child pornography in searching for identity theft on January 3.  I

previously rejected this argument in my Order on the Franks motion.  There is no evidence that

Investigator Clark was motivated to search for child pornography.  In fact, all the evidence and

testimony points to the contrary.  Investigator Clark credibly testified as to the process he used in

mirroring the Acer laptop's hard drive, how he was looking for (and found) evidence of identity

Page 45 - OPINION AND ORDER ON MOTIONS FOR SUPPRESSION

theft and forgery, and how he discovered the child pornography.  Notably, Detective Visnaw

communicated with the prosecutor in charge of identity theft from the beginning of the

investigation.  Further, Kowalczyk's argument about the delay between seizing the digital

evidence and obtaining a warrant to search the digital evidence undermines his argument that

Detective Visnaw and Investigator Clark were motivated from the beginning to search for child

pornography–why wait several days if there could be potential victims of abuse?

Finally, Kowalczyk argues that Clark had no authority to open the files he believed to

contain child pornography since their titles had nothing to do with identity theft.  Clark's report

and testimony indicated he opened the files to confirm they contained images "consistent with

their names."  MTS-127, at 3.  Defense counsel argues this is a violation of the Fourth

Amendment.  See United States v. McCarty, 648 F.3d 820, 836 (9th Cir. 2011) (TSA read content

of letters to confirm concern about child pornography exceeded scope of administrative search).

He also argues that the incriminating nature of the photographs was not apparent from their

names alone, so the plain view exception is inapplicable.

The warrant allowed Clark to search for data files and graphic files for evidence of

identity theft and fraud.  He found files with names indicating they were child pornography, but

he knew file names may be inaccurate and can be changed–even to something suspicious as a

"ha, ha, I got you."  He previewed only seven of the hundreds of files and, finding that they were

in fact child pornography, he stopped his search.

I agree with the government that Investigator Clark's actions comport with those

approved in United States v. Giberson, 527 F.3d 882 (9th Cir. 2008).  In that case, a forensic

investigator was reviewing a computer for records relating to the creation of identification cards

when he discovered images of child pornography.  Because he was searching the computer by

reviewing thumbnails (reduced-sized versions) of the images, he could see pictures depicted

child pornography.  He "immediately stopped his search" and notified the case agent, who told

him to continue his search but print out images of child pornography he discovered along the

way.  Meanwhile, another search warrant was obtained.  The Ninth Circuit upheld the series of

events, stating,

> Computer records are extremely susceptible to tampering, hiding, or destruction,
> whether deliberate or inadvertent.  Images can be hidden in all manner of files,
> even word processing documents and spreadsheets.  Criminals will do all they can
> to conceal contraband, including the simple expedient of changing the names and
> extensions of files to disguise their content from the casual observer.

527 F.3d at 889.

Like Giberson, Investigator Clark described previewing the hard drive while it was

imaging, taking note of both evidence of fraud and identity theft, and stopping the search once he

discovered child pornography, but allowing the mirroring process to continue so he could start

his work the next day.  He called Detective Visnaw to discuss how to proceed.  Investigator

Clark cannot be faulted for opening file names indicative of child pornography when, as he

testified credibly, file names alone are not determinative of content.  He was engaged in a search

of the hard drive for evidence of identity theft and forgery, as allowed by the warrant, he

discovered images of children engaged in sexually explicit conduct, and once opened, the

incriminating nature of the images was apparent.  See United States v. Wong, 334 F.3d 831, 838

(9th Cir. 2003).  He then responsibly stopped his preview and contacted Detective Visnaw for a

Page 47 - OPINION AND ORDER ON MOTIONS FOR SUPPRESSION

new warrant.[24]

In his pro se motion, Kowalczyk also contends that this warrant was unreasonably delayed, suggesting that the police knew about the child pornography as early as the date they arrested Kowalzcyk.  Although Detective Visnaw knew about the images on the camera, he operated responsibly to obtain search warrants, without including the camera, to search for identity theft and forgery.  There was no unconstitutional delay.

This motion is denied.

VIII.    Personal Property Warrant

Kowalczyk argues that the January 5 warrant was tainted by the evidence found in the search incident to arrest, and the evidence located during the January 3 and January 4 warrants. This warrant is legal based on my decision upholding the search incident to arrest, or alternatively, the inventory search.

IX.    Warrantless Seizure of Mini-Storage Unit

Kowalczyk argues the storage unit was unlawfully seized upon direction by the police and that police unreasonably delayed in obtaining a search warrant until two months later.  A seizure occurs when "there is some meaningful interference with an individual's possessory interest in that property."  United States v. Jacobsen, 466 U.S. 109, 113 (1984).  Here, Detective Lewis instructed management to place a lock on the unit and not let anyone access the unit.  This was a

---

[24]Arguably Investigator Clark opened too many images.  He testified he wanted to make sure the images were not accidentally saved or downloaded by automatic software.  See McCarty, 648 F.3d at 836 (TSA screener no longer searching for explosives when reading letters). Regardless, however, there is no question in my mind that he inadvertently discovered the first image.  If the remaining six do not fall in this category, they would inevitably have been discovered pursuant to the subsequent January 4 search warrant.

seizure.[25]  Nevertheless, although Lewis' report indicates no probable cause to believe the storage

unit contained any evidence of crime, I reject Kowalczyk's argument that police had no probable

cause to seize the storage unit.  Given what they had located in his luggage and on his computers,

the Puyallup police knew with a fair probability that contraband or evidence of identity theft,

forgery, financial fraud, or possession of child pornography would be found in the storage unit.

In order to assure that the storage unit was not accessed by anyone, Puyallup police acted

reasonably in seizing the unit.  Segura, 468 U.S. at 810 (acceptable to "secure a dwelling, on the

basis of probable cause, to prevent the destruction or removal of evidence while a search warrant

is being sought is not itself an unreasonable seizure").

Nevertheless, just as with the digital evidence held for several days before Detective

Visnaw obtained a warrant, "a seizure reasonable at its inception because based upon probable

cause may become unreasonable as a result of its duration or for other reasons." Id. at 812.  Even

if, as they implied in their line of questioning, I accept the government's suggestion that the

seizure executed by Puyallup should be segregated from the warrant obtained by ICE Agent

Findley, when all evidence indicates the investigatory efforts were coordinated, Agent Findley

knew about the storage unit about a month before he obtained a search warrant.  In the meantime,

Kowalczyk had informed his father to make every effort to enter the storage unit.  I could find no

case holding such a delay reasonable, and the government pointed me to none.

This is not the end of the inquiry, however.  As the government noted in its oral argument

---

[25]I reject the government's argument that because Kowalczyk was in jail at the time of the
overlock, there was no "seizure" of the storage unit.  Kowalczyk's father had a key and
permission to access the unit.  While Kowalczyk's possessory interests may have been
diminished by his incarceration, he still had a possessory interest in the storage unit.

on the supplemental briefing, not every Fourth Amendment violation should result in application

of the exclusionary rule.  See Herring, 555 U.S. at 144 (exclusionary rule should apply to

"deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or

systemic negligence").  I am persuaded by the Supreme Court's conclusion in Segura which,

although it involved a much shorter seizure, found the officers' prioritization of tasks, combined

with the diminished possessory interests of the arrested individuals, meant the seizure of their

apartment pending a warrant was not unreasonable.  Similarly, here, there is no evidence of bad

faith; Agent Findley credibly testified that investigatory efforts were focused on finding

remaining victims.  I cannot fault him for prioritizing the need to identify children involved in the

sexual abuse depicted in the images over collecting evidence to prosecute Kowalczyk.  There is

no evidence ICE agents repeatedly failed to comply with their constitutional obligations in this

context.  Agent Findley's failure to obtain a warrant was purely negligent.  Furthermore, as I

indicated above, Kowalczyk was "under arrest and in the custody of the police throughout the

entire period" of the seizure.  Segura, 468 U.S. at 813.  Thus, as in Segura, "[t]he actual

interference with [Kowalczyk's] possessory interests in the [storage unit] and its contents was . . .

virtually nonexistent."  Id.

        In sum, I find the delay unconstitutional, but because the exclusionary rule is triggered

only if the police action is "sufficiently deliberate that exclusion can meaningfully deter it, and

sufficiently culpable that such deterrence is worth the price paid by the justice system,"

application of the rule here, where Agent Findley acted negligently, does not "pay its way."

Herring, 555 U.S. at 144, 147-48.  I deny the motion to suppress evidence from the storage unit.


Page 50 - OPINION AND ORDER ON MOTIONS FOR SUPPRESSION

X    ICE Search of Mini-Storage Unit

Defendant's sole assertion is that this warrant is tainted from the other unconstitutional actions of the government. I have upheld the other governmental actions.

XI.    FBI's Search Warrant of Defendant's Person at Pierce County Jail

The warrant, obtained by FBI Agent Kimes, sought authorization to "examine the body" of Kowalczyk for "identifying physical characteristics, such as moles, birthmarks, and the like, and to *document* any such identifying characteristics found *by video recording and still photography*." MTS-124A (emphasis added). The warrant also required Agent Kimes to first attempt to contact any attorney who may be representing Kowalczyk in the pending state case and allow the attorney the opportunity to be present during execution of the warrant.

Defense counsel's sole assertion is that this warrant is tainted from the other unconstitutional actions of the government. I reject this argument.

Kowalczyk, in his pro se motion, takes issue with the way in which the search warrant was executed. For about an hour, Kowalczyk was photographed by a woman who was the backup photographer for the regular male photographer away at a training, while FBI Special Agent Jim Cole inspected Kowalczyk's body. Agent Kimes stood outside the cell, with a number of Pierce County police officers, logging the photographs on a chart. Apparently, Kowalczyk was in between counsel, having recently paid the retainer for a new attorney, but not having signed the agreement. Kowalczyk cites strip search cases, involving the warrantless search of pretrial detainees, for the proposition that his constitutional rights were violated which, he argues, should result in the suppression of the photographs. See Byrd v. Maricopa Cnty. Sheriff's Dept., 629 F.3d 1135, 1141 (9th Cir. 2011) (cross-gender strip searches of pretrial

detainees unreasonable under the Fourth Amendment pursuant to a four-factor test).

"The test of what is necessary to execute a search warrant effectively is reasonableness. An officer's conduct in executing a search is subject to the Fourth Amendment's mandate of reasonableness from the moment of the officer's entry until the moment of departure." San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose, 402 F.3d 962, 971 (9th Cir. 2005). A court must examine the "totality of the circumstances to determine whether a given search was reasonably executed." United States v. Combs, 394 F.3d 739, 743 (9th Cir. 2005); Franklin v. Foxworth, 31 F.3d 873 (officers detained individual while executing warrant in "a manner that wantonly and callously subjected an obviously ill and incapacitated person to entirely unnecessary and unjustifiable degradation and suffering").

Here, the photographs were taken pursuant to a search warrant signed by United States Magistrate Judge David Christel.  The search warrant was supported by probable cause that Kowalczyk had taken pictures of himself sexually abusing two small children, more than adequately justifying the need for the search.  Agent Kimes testified at the suppression hearing that she used a female photographer because the FBI's male photographer was not available.  The photographer took fewer than 50 pictures and never touched Kowalczyk's body.  Only a handful of people were involved.  Under the totality of the circumstances, the search was reasonably executed.

Additionally, I reject any argument that Kowalczyk was denied counsel or that the warrant did not permit photographs when it directed agents to  "document" the identifying characteristics.  With respect to the attorney, Agent Kimes testified that "prior to the warrant actually being executed, we had waited for a period of time, because I believe Mr. Kowalczyk

was in contact with his attorney.  We faxed a copy of the warrant to the attorney.  And what we

were told was that the attorney had advised him to allow the search."  Tr. 479:2-8 (June 1, 2012).

As for the language of the warrant, it very clearly directed the agents to "document . . . by video

recording and still photography" the identifying marks on Kowalczyk's body.  MTS-124A

      I deny this motion.

XII.    Additional Pro Se Arguments

    A.    Motel Registry

      Kowalczyk argues under Washington law that the registry search was unconstitutional.

State v. Jorden, 160 Wash. 2d 121, 156 P.3d 893 (2007).  That case held, "[T]he practice of

checking the names in a motel registry for outstanding warrants without individualized or

particularized suspicion violated the defendant's" rights under the Washington State constitution.

Officers here had sufficient reason to check the motel registry based on the Des Moines elude.

      Even assuming Washington law would preclude the registry search that occurred here,

which I doubt, see, e.g. In re Nichols, 171 Wash. 2d 370, 256 P.3d 1131 (2011), federal law

provides no privacy interest in a motel registry.  United States v. Cormier, 220 F.3d 1103, 1108

(9th Cir. 2000) (no Fourth Amendment violation and, furthermore, general rule is that "evidence

will only be excluded in federal court when it violates federal protections").  Kowalczyk's

disagreement with the decision is irrelevant; the Ninth Circuit law is controlling precedent.

      Kowalczyk's motion to suppress on this ground is denied.

    B.    Impoundment of the Lincoln

      Kowalczyk argues, in his pro se motion, that: (1) there was no reason to impound and

search the Lincoln because Sergeant Bell knew there were no documents in the car which would

Page 53 - OPINION AND ORDER ON MOTIONS FOR SUPPRESSION

disclose the driver's identity–the driver had searched for them and come up empty-handed;
(2) the officers had no authority under statute or ordinance to impound the car; (3) the car was
not evidence of the felony crime of eluding an officer; and (4) the car was rat-trapped, yet
improperly impounded without a warrant.

Kowalczyk relies on a test that has been overruled, requiring that a seizure of a car was
only permitted without a warrant when the car was "movable and for which it is not practicable
to secure a warrant." United States v. McCormick, 502 F.2d 281, 287 (9th Cir. 1974).  In United
States v. Bagley, 772 F.2d 482, 490 (9th Cir. 1985), after discussing the old test, the court
concluded that "the existence of probable cause alone justifies a warrantless search or seizure of
a vehicle lawfully parked in a public place."  See also United States v. Noster, 590 F.3d 624, (9th
Cir. 2009) (police had probable cause car was stolen and had authority to seize it).

Here, Sergeant Bell testified that he was not satisfied with the driver's statements and
cursory search of the driver's side door pocket.  He believed the car would contain evidence of
ownership.  Although Des Moines had information that the registered owner of the Lincoln was
Alex Craciun, who had sold the car to a "Walter George" a month or two before, and Sergeant
Bell had identified a "Benny Mazzola" as the driver, who had a record as "Andrew Kowalczyk,"
Des Moines police could properly believe, given all of these identities, that the car would contain
additional information about the true identity of the driver.  Furthermore, Sergeant Bell had
probable cause that the driver had used the Lincoln to commit the felony offense of eluding a
police vehicle, a class C felony, which permitted him to impound the car.  RCW 46.61.024(1)
(felony elude); Maddox, 614 F.3d at 1050 (citing State v. Williams, 102 Wash. 2d 733, 689 P.2d
1065, 1071-72 (1984) for rule that officer may impound car if it was used in the commission of a

felony); State v. Espindola, 162 Wash. App. 1015, 2011 WL 2238352, at *3 (2011) (probable

cause to believe driver attempted to elude entitled police to impound the car).

Kowalczyk's motion to suppress on this ground is denied.

C.      Police Pounding on Motel Room Door

Kowalczyk asserts that police hounded him in his motel room, knocking on the door,

calling into the room, and threatening release of dogs.  He reports the kicking of the door

knocked off the light fixture outside the room door.  As a result, he argues, he was

"constructively arrested" by the harassment.  This motion is denied; Kowalczyk did not respond

to the officers' contacts and, thus, could not be deemed to have been arrested at that time.

D.      Sergeant Bell's Identification of Kowalczyk

Kowalczyk argues that Sergeant Bell reviewed one photograph–an old booking

photograph from Washington County–and that a single-photograph lineup is overly suggestive

and unconstitutional.  In addition, he challenges Sergeant Bell's positive identification given the

limited access he had to Kowalczyk.  He argues Sergeant Bell was at the Lincoln for one minute

and eight seconds initially, the front windows were Limo-tinted, and the window was two-thirds

up.  Bell stood above and over the car, since the car was low to the ground.  When Bell returned

to the Lincoln, he stood there for 18 seconds before the driver took off.  Finally, Kowalczyk

asserts that Sergeant Bell was unable to make an identification during a photograph throw-down

in mid-January.

"Suggestive pretrial identification procedures may be so impermissibly suggestive as to

taint subsequent in-court identifications and thereby deny a defendant due process of law."

Bagley, 772 F.2d at 492.  If the procedure is not "impermissibly suggestive," the analysis ends.

Even if the procedure is impermissibly suggestive, the identification may be used as evidence if,

under the totality of the circumstances, the identification is reliable.

> Several factors which should be considered in evaluating the reliability of both
> in-court and out-of-court identifications are: (1) the opportunity of the witness to
> view the criminal at the time of the crime; (2) the witness' degree of attention; (3)
> the accuracy of the witness' prior description of the criminal; (4) the level of
> certainty demonstrated by the witness at the confrontation; and (5) the length of
> time between the crime and the confrontation.

Id.

In this circumstance, where Puyallup had sent one booking photograph to Sergeant Bell to

"determine if this was the individual that was driving the vehicle," without further instructions,

directions, or emphasis, and for the purpose of initially identifying the suspect, I find this was not

an overly suggestive identification procedure.  Tr. 65:6-8 (May 31, 2012); Bagley, 772 F.2d at

492-94 (not impermissibly suggestive to transport robber, handcuffed in police car, to bank teller

for an identification).

Even if it were, the identification is reliable under the totality of the circumstances.

Sergeant Bell testified that he was standing right outside the driver's side window looking at one

person–the driver.  The patrol video reflects that he stood outside the Lincoln for almost a minute

and a half.  The street was well-lit, the spotlight on his police car was on, and he had a flashlight

to look at the driver.  He testified that he could clearly see the driver.  He made the identification

only six hours later and was almost certain the booking photograph depicted the driver.  He gave

a fairly accurate description of the driver.

Finally, as Sergeant Mohr explained, Sergeant Bell identified Kowalczyk from a photo

montage of six images after Kowalczyk's arrest, on January 8.  There is no evidence or testimony

that Sergeant Bell saw or was influenced by any media coverage of the case before he made his

identification.

Kowalczyk's motion is denied.

E.    Delay Between Arraignment and Arrest

Kowalczyk complains that he was arrested at 8:17 a.m. on December 27, but was not

arraigned until December 31 at 10:30 a.m.  He says he was taken to the Puyallup police station

and was not booked at the Pierce County jail until 8:57 p.m. the next day.  He urges the

suppression of all evidence obtained during the delay, arguing that police used the time to gather

evidence to support their claim of probable cause.  Further, he argues, if they arrested on the

Oregon warrant, they were required to follow Washington law and were not allowed to inventory

the property until Kowalczyk had the opportunity to post bail.  State v. Caldera, 84 Wash. App.

527, 929 P.2d 482 (1997) (citing RCW 10.31.030).

With respect to federal law, the requirement for a "prompt judicial determination of

probable cause" applies only to a warrantless arrest.  Gerstein v. Pugh, 420 U.S. 103, 125 (1975).

I have concluded that Kowalczyk was properly arrested pursuant to an Oregon arrest warrant.  If

that was not a sound basis for arrest, the government has given me no reason to find any delay

was reasonable on a probable cause determination on the elude, forgery and identity theft charges

other than to argue it is a matter between him and the state.  I offer no opinion on that, but note

only that evidence will be suppressed as a result of any violation of this rule only if it is the "fruit

of the poisonous tree."  Anderson v. Calderon, 232 F.3d 1053, 1071-72 (9th Cir. 2000), overruled

in part on other grounds, Bittaker v. Woodford, 331 F.3d 715, 728 (9th Cir. 2003).  As the

government notes, the delay is not linked to the seizure of any evidence relevant to this federal

Page 57 - OPINION AND ORDER ON MOTIONS FOR SUPPRESSION

indictment.

As for whether Puyallup was not permitted to inventory property without offering Kowlaczyk the opportunity to post bail, it is unclear whether any violation of a Washington statute would require the exclusion of evidence when no violation of federal law occurred. <u>United States v. Becerra-Garcia</u>, 397 F.3d 1167, 1173 (9th Cir. 2005) (describing general rule that state law taint does not require exclusion); <u>see also</u> <u>infra</u> section IV.B. Second, based on what the officers discovered during the search incident to arrest, they had probable cause to hold him on at least the elude, forgery, and identity theft charges, and there was no need for them to allow him to post bail. <u>State v. Ross</u>, 106 Wash. App. 876, 26 P.3d 298, 301 (2001). Finally, even setting aside the evidence discovered during the search incident to arrest, there is no evidence Kowalczyk had sufficient money on his person to make bail on the Oregon warrant ($50,000 or 10% plus a Release Agreement) prior to the police conducting the inventory search, and police have no obligation to "provide further opportunities" to make bail. <u>State v. Adkins</u>, 112 Wash. App. 1016, 2002 WL 1316515, at * 3 (2002).

Kowalczyk also argues there was insufficient probable cause to hold him for identity theft. Based on the items discovered, Puyallup police had probable cause to arrest him for forgery and identity theft. I deny this motion.

     F.    <u>Problems with Location of Evidence in Luggage</u>

Kowalczyk complains that the reports conflict about where particular pieces of evidence were located and in which piece of luggage. He argues that, because of this uncertainty, all of the evidence must be suppressed. I have set forth the facts as adduced at the evidentiary hearing, based on the testimony of those witnesses whom I found credible about which luggage was

searched.  Any issues regarding admissibility or foundation can be addressed at trial.

G.     Specificity of Warrants

Kowalczyk challenges the purported lack of detail in each of the warrants.

"[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation,

and particularly describing the place to be searched, and the persons or things to be seized."  U.S.

Const. Amend. IV.

> In determining whether a warrant is sufficiently particular, we consider one or more of the following factors:
>
> (1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued.

United States v. Adjani, 452 F.3d 1140, 1147-48 (9th Cir. 2006) (some internal citations omitted).

1.     December 27 Warrant

Kowalczyk argues that the December 27 warrant was overbroad and did not identify

items to be seized and searched with particularity.  To that end, he challenges the warrant on four

grounds.

First, he argues the warrant provided for search and seizure of checks, credit cards, mail

and other documents with any and all *victims'* personal information, but no victims' names were

specified.  As a result, he argues, police were permitted to seize anything that had a name other

than Kowalczyk's on it.  I find the warrant was sufficiently specific given that this was the very

beginning of the investigation.  Detective Visnaw did not yet know victims' names, but knew

Kowalczyk had used someone else's identity to check into the motel and believed evidence of

Page 59 - OPINION AND ORDER ON MOTIONS FOR SUPPRESSION

fraudulent activity would be apparent from checks, credit cards and mail bearing others' names. Detective Visnaw crafted the warrant as specifically as the circumstances would permit.

Next, the warrant provided for search and seizure of computer equipment, including laptop or desktop computers, printers, hard disk drives, floppy disk drives or any and all other mass storage devices, *peripherals*, or software. Kowalczyk argues the "peripherals" word is too broad. Again, I disagree. Use of the word "peripherals," in the context of the more specific words was sufficient to inform officers which items in the room were subject to seizure.

The warrant permitted the search and seizure of photos, blank plastic cards, or completed fake State identification cards, driver's licenses or other identification cards, and "any and all equipment required to manufacture identification cards." MTS 119A. Kowalczyk argues the "any and all equipment" is too broad because it does not specify what kind of equipment. Again, I disagree. Detective Visnaw knew officers had already obtained equipment used to create fake identification cards–a laptop computer, blank plastic card stock, false identification cards, a digital camera, a card reader, a desktop computer, a flat screen computer monitor, and boxes for a computer printer and scanning device–and he described additional, similar equipment officers were permitted to seize under the warrant. Read in context, the warrant's language was sufficiently specific.

Finally, the warrant provided for the search and seizure of "[a]ny other evidence relating to the crimes of Identity Theft and Forgery." Kowalczyk take issue with "any other evidence" as too broad. I disagree. The language "any other evidence" is linked to the crimes of identity theft and forgery, sufficiently limiting officer discretion in the items they seized. See United States v. Meek, 366 F.3d 705, 715-16 (9th Cir. 2004) (reference to charged crime provides "objective and

adequate guidance").

Kowalczyk also argues that the warrant directed the seizure of items at the Northwest

Motor Inn, but not the search and seizure of the evidence already located at the Puyallup police

department seized from the parking lot and searched at the time of the arrest. As I explained

above, however, this argument is moot. Detective Visnaw explained that the bags seized at the

time of arrest were not searched pursuant to the December 27 motel room warrant. As a result,

the officers did not exceed the scope of the warrant.

2.    January 3 and 4 Warrants

Kowalczyk challenges the terms "computer data files" and "database entries" as

unconstitutionally general. He also challenges the references to "others not identified" and "co-

conspirators" as lacking in probable cause. With respect to identity theft, he suggests Detective

Visnaw only had probable cause to search for evidence of identity theft from 2007, when

Mazzola and George reported the identity-theft related problems began. For similar reasons as

those set forth with respect to the December 27 warrant, these warrants were sufficiently specific.

Further, to say that officers were limited in the years they could investigate is nonsense when

ample evidence, based on the items located in his luggage, indicated Kowalczyk was engaged in

identity theft up until his arrest.

3.    March 11 Warrant

Kowalczyk argues there was no nexus between the storage unit and the crime he is

alleged to have committed. As he did in his Franks motion, he challenges the reliability and bias

of the victims' mother. As I mentioned in my Order on the Franks hearing, Kowalczyk does not

explain why the mother would be motivated to lie about Kowalczyk's access to her children

Page 61 - OPINION AND ORDER ON MOTIONS FOR SUPPRESSION

around the time the sexually explicit pictures were taken.  The March 11 warrant was sufficiently specific and was supported by probable cause.

## CONCLUSION

Kowalczyk's Pro Se Motion for Suppression [224] and the counseled Motion for Suppression [141] are denied.

IT IS SO ORDERED.

DATED this _____3rd_____ day of August, 2012.


_____/s/ Garr M. King_____
Garr M. King
United States District Judge

Page 62 - OPINION AND ORDER ON MOTIONS FOR SUPPRESSION